# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2012-CA-00107-SCT

*MINNESOTA LIFE INSURANCE COMPANY f/k/a*
*MINNESOTA MUTUAL LIFE INSURANCE*
*COMPANY; RUSSELL LAVERNE BAYNE, JR.;*
*CHARLES SPENCER BOYD; LISA WAGONER;*
*AND MARTIN ROBERT WAGONER*

*v.*

*COLUMBIA CASUALTY COMPANY d/b/a CNA*
*AND/OR d/b/a CNA INSURANCE COMPANIES;*
*CONTINENTAL CASUALTY COMPANY d/b/a*
*CNA AND/OR d/b/a COLUMBIA CASUALTY*
*COMPANY AND/OR d/b/a CNA INSURANCE*
*COMPANIES*

### ON MOTIONS FOR REHEARING

| | |
|---|---|
| DATE OF JUDGMENT: | 12/20/2011 |
| TRIAL JUDGE: | HON. ROBERT P. KREBS |
| TRIAL COURT ATTORNEYS: | CLYDE H. GUNN, III |
| | CHRISTOPHER C. VAN CLEAVE |
| | SHEILA J. CARPENTER |
| | BETH GROVER WIEDERHOLT |
| | BEN E. SHEELY |
| | DAVID A. JONES |
| | KIMBERLY E. BLAIR |
| | JOHN A. BANAHAN |
| | H. BENJAMIN MULLEN |
| | REBECCA L. ROSS |
| | HELEN ALFORD JOHNSON |
| | ARTHUR MADDEN |
| COURT FROM WHICH APPEALED: | JACKSON COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | CHRISTOPHER COLLINS VAN CLEAVE |
| | CLYDE H. GUNN, III |
| | WILLIAM CORBAN GUNN |
| | DAVID NEIL HARRIS, JR. |

ATTORNEYS FOR APPELLEES: H. BENJAMIN MULLEN
 JOHN A. BANAHAN
 REBECCA L. ROSS
NATURE OF THE CASE: CIVIL - INSURANCE
DISPOSITION: AFFIRMED IN PART; REVERSED IN PART
 AND REMANDED - 05/07/2015
MOTION FOR REHEARING FILED: 12/15/2014
MANDATE ISSUED:

**BEFORE RANDOLPH, P.J., LAMAR AND KITCHENS, JJ.**

**RANDOLPH, PRESIDING JUSTICE, FOR THE COURT:**

¶1. The motion for rehearing filed by Appellants is denied. The motion for rehearing filed by Appellees is denied. The original opinion is withdrawn and this opinion is substituted therefor.

¶2. The Jackson County Circuit Court granted summary judgment in favor of Columbia Casualty Company and Continental Casualty Company[1] (collectively "Columbia"), finding there was no wrongdoing in denying coverage to four former insureds (collectively "Ex-Agents") and Minnesota Mutual Life Insurance Company ("Minnesota Life"). The trial court also denied the Ex-Agents' and Minnesota Life's motion to strike certain affidavits and exhibits submitted by Columbia in support of its motions for summary judgment and in defense of the Ex-Agents' and Minnesota Life's summary judgment motions. We find that the trial court properly denied the motion to strike and properly granted summary judgment

_____

[1] CNA Financial Corporation is not a party to this appeal. The trial court granted CNA's motion for summary judgment after the Ex-Agents and Minnesota Life withdrew their claims against CNA. The Ex-Agents and Minnesota did not appeal the trial court's ruling as to CNA.

2

in favor of Columbia as to Minnesota Life's claim but erred in its reasoning for granting summary judgment as to the Ex-Agents' claims. Therefore, we affirm in part and reverse in part and remand.

## FACTUAL/PROCEDURAL BACKGROUND[2]

¶3.     In 1997, Martin Wagoner, Lisa Wagoner, Charles Spencer Boyd, and Russell Bayne (collectively "Ex-Agents") were employed by C. Douglas Gulley Jr. and Associates, Inc., ("Gulley Agency") as agents for Minnesota Life. Douglas and all the Ex-Agents were afforded the opportunity to purchase coverage under an Insurance Agents Errors & Omissions Policy. Gulley and the Ex-Agents separately purchased and paid for such coverage. A policy was issued by Columbia, covering the period from March 1, 1997, to March 1, 1998 ("1997 Policy"). This policy subsequently was renewed by the policyholder, Minnesota Life, for the period from March 1, 1998, to March 1, 1999 ("1998 Policy").[3]

---

[2] Some of the events, facts, and dates are disputed. Their recitation herein is for analyses of policy coverage, coverage periods, coverage exclusions, and coverage exceptions, *inter alia*. In the proceedings on remand, the trial court is not bound by its prior rulings or this Court's synopsis of a vast record. The trial court is bound only by this Court's decision on policy interpretation and its conclusions found in ¶¶ 69-72, *infra*. *See, e.g., Johnson v. State*, 529 So. 2d 577, 579 (Miss. 1988) ("where a case has been reversed and remanded for a new trial, a trial de novo follows. Thus, on remand, where the defendant desires to introduce new evidence not considered at the first trial, the trial judge is required to permit a new evidentiary hearing. This is true even though the issue had been determined at the first trial, and this Court expressly affirmed the trial court's ruling on the first appeal."). Stated otherwise, the proceedings on remand are controlled by applicable law and the evidence admitted in that new proceeding.

[3] For the issues pertinent to this opinion, the 1997 and 1998 policies are nearly identical.

3

*Policy Provisions*

¶4. Minnesota Life was the named policyholder of the 1997 and 1998 Policies. The policies defined an "insured" as a contract agent and any business entity engaged in professional services which employs the insured. A "contract agent" was defined as an agent who is under contract with Minnesota Life.

¶5. Under the policies, Minnesota Life also was listed as an "additional insured" pursuant to an endorsement,[4] entitled "VICARIOUS LIABILITY COVERAGE: Co Defendant - Defense Costs Only," which limited its liability. The endorsements specifically stated:

> In consideration of the premium charged, it is hereby understood and agreed that Minnesota Mutual Life Insurance Company and the companies represented in Item 7 of the Declarations shall be additional **Insureds** under this policy, but *only under Coverage Agreement B* and *only when it is named as a co-defendant in a **Claim** against the **Insured** due to a **Wrongful Act** attributable solely to an **Insured***/Agent and not due to any independent negligence or bad faith of Minnesota Mutual Life Insurance Company* and/or the companies represented in Item 7 of the Declarations.
>
> Coverage provided pursuant to this endorsement shall be subject to all of the terms, conditions and exclusions of the policy to which this endorsement is attached.
>
> All other terms, conditions and exclusions of this policy remain the same.

(Emphases in original and added.)

¶6. The policies were claims-made policies, meaning coverage was triggered when a claim was made against the insured(s) during either the policy period or the extended claims-

---

[4] See Endorsement No. 9 of the 1997 Policy; for the 1998 Policy, see Endorsement No. 8.

reporting period, if applicable. In capital letters and separated by a box at the top of page three was the following statement:

> THIS IS A CLAIMS-MADE POLICY AND, SUBJECT TO ITS PROVISIONS, APPLIES ONLY TO ANY "CLAIM" FIRST MADE AGAINST THE INSURED DURING THE POLICY PERIOD. NO COVERAGE EXISTS FOR CLAIMS FIRST MADE AFTER THE END OF THE POLICY PERIOD UNLESS, AND TO THE EXTENT, THE EXTENDED CLAIM REPORTING PERIOD APPLIES.

The COVERAGE section of the policies specifically provided that:

> The Insurer shall have the right and duty to defend any Claim or suit against the Insured seeking sums payable under this Insurance, even if any of the allegations of the suit are groundless, false or fraudulent. The Insurer may make such investigation and with the written consent of the insured, make settlement of any claim as it deems expedient, but the Insurer shall not be obligated to pay any claim or judgment or to defend any claim or suit after the applicable limit of the Insurer's liability has been exhausted by payment of judgments or settlements.

The COVERAGE section also stated that a "wrongful act" must occur during the policy period or after the policy period if (1) at the time of the effective date of the policy, the insured had no knowledge of any wrongful act and (2) "there is *no other valid and collectible insurance available to the **Insured** for any such **Wrongful Act**.*" (Emphases in original and added.) The policies excluded "any **Claim** based upon, or arising out of any dishonest, deliberately fraudulent, malicious or knowingly **Wrongful Act**, error or omission committed by or at the direction of the **Insured**." (Emphasis in original.)

¶7. The policies provided the following notice requirement:

> Upon any **Insured** becoming aware of any **Wrongful Act** which would reasonably be expected to result in a **Claim** against any **Insured**, written notice

5

with all available particulars shall be given by or for the **Insured** to the Insurer or its authorized representative. If a **Claim** is made or suit is brought against any **Insured**, the **Insured** shall as soon as practicable during the Policy Period, or during the **Extended Claim Reporting Period**, if applicable, notify the Insurer and immediately forward to the Insurer every demand, notice, summons or other process received.

. . . Written notice shall be sent to the Insurer to the attention of:
Professional Liability Claims Manager
CNA Financial Insurance Group
CNA Insurance Companies
NY, NY 10038.

(Emphasis in original.)

¶8.     The policies permitted claims against the Insurer only when "the **Insured** shall have fully complied with all the terms of this policy, [or] until the amount of the **Insured's** obligation to pay shall have been finally determined either by judgment against the **Insured**, after actual trial or by written agreement of the **Insured**, claimant and the Insurer." (Emphasis in original.) Additionally, the policies provided that the "**Insured** shall not, except at their own cost, voluntarily make any payment, assume any obligation or incur any expense." (Emphasis in original.)

¶9.     The policies' excess (or other insurance) provision was amended[5] to state:

If the **Insured** has *other insurance in force which would apply to a **Claim** also covered by this policy*, including but not limited to the Automatic **Extended Claim Reporting Period** and/or if elected, the Optional **Extended Claim**

---

[5] The original provision which was deleted stated, in part, "[i]f the **Insured** has other insurance against a **Claim** covered by this policy. . . ." (Emphasis in original.) The amended language clarifies that the additional insurance policy must also provide coverage for a specific claim that is covered under the policies to trigger the excess provision.

6

**Reporting Period** . . . this policy shall be excess over such other valid and collectible insurance and shall then apply only in the amount by which the applicable Limit of Liability of this policy exceeds the sum of the applicable Limit of Liability of all other insurance.

(Emphases in original and added.)

¶10. Finally, the policies did not allow an Extended Claim Reporting Period "[i]f the **Insured** is issued the *same or similar policy* with this Insurer, or any other Insurer. . . ." (Emphasis in original and added.)

### *Background*

¶11. In late 1997, the Ex-Agents began to suspect that Gulley was embezzling funds from clients. On December 22, 1997, the Ex-Agents informed Minnesota Life of their suspicions and provided Minnesota Life with evidence of Gulley's embezzlement. Upon receiving this information, Minnesota Life took no immediate action.

¶12. On January 30, 1998, each Ex-Agent individually resigned from the Gulley Agency. On February 1, 1998, the Ex-Agents founded Cornerstone Group, LLC, which is affiliated with Linsco Private Ledger ("LPL"). On February 2, 1998, the Ex-Agents' contracts with Minnesota Life were terminated. Upon joining LPL, each Ex-Agent obtained separate errors and omissions coverage ("AIG Policy") issued by American International Speciality Lines Insurance Company ("AIG").

¶13. On March 16, 1998, the Mississippi Secretary of State's office began investigating the records of the Gulley Agency and, from that investigation, determined that Gulley had

7

misappropriated client funds. In July 1998, four cases[6] were filed against Gulley, the Gulley Agency, Minnesota Life, and the Ex-Agents. Each complaint alleged that the wrongful acts occurred while the Ex-Agents were employed by Minnesota Life. Each complaint alleged causes of action for breach of fiduciary duty, misrepresentation and concealment, breach of implied covenant of good faith, continuing breach of contract, negligence, negligent infliction of mental and emotional distress, misrepresentation, and malpractice. As to Minnesota Life, each complaint specifically alleged that Minnesota Life participated in and/or had knowledge of the intentional taking of monies. As to the Ex-Agents, the complaints specifically alleged that they should have known that Minnesota Life and/or Gulley were misappropriating funds. On July 17, 1998, after receiving notice of these claims filed against them, the Ex-Agents met with and retained Clyde H. (Buddy) Gunn to defend them.

¶14.    Several days after retaining Gunn, the Ex-Agents notified Minnesota Life's broker, AON, and AIG's broker, Barney & Barney, that they had been named as defendants in four lawsuits related to Gulley's embezzlement of funds. Included in the Ex-Agents' notification to AON was an Errors and Omissions Claim Report. The Claim Report asked that all other Errors and Omissions policies be identified, and the Ex-Agents stated they presently had policies issued by AIG. The form specifically required that notification of the claims be made

---

[6] In one case, *Garrett*, the Ex-Agents were not named as defendants until the Second Amended Complaint.

8

to AON. AON then provided copies of the four complaints to Traub, Eglin, Lieberman & Strauss ("TELS"), a law firm which provided advice to Columbia concerning any legal issues that arose in regard to the claims under Minnesota Life's agents' policies. The notifications provided TELS with copies of the complaints identifying the claims made against Minnesota Life and the Ex-Agents. The notifications did not specifically request a defense on behalf of Minnesota Life. In fact, the first letter to TELS from AON stated "[a]lthough intentional acts are not covered, however, we felt an incident report should be filed."

¶15.    On August 10, 1998, TELS contacted AIG and AIG's broker to inquire about AIG's position on coverage for the Ex-Agents. TELS was notified by AIG that AIG would provide coverage for the Ex-Agents for claims made against them while they were employed by LPL. TELS sent a written confirmation to AIG noting that AIG would provide coverage for the Ex-Agents. On August 14, 1998, AIG contacted the Ex-Agents,  acknowledging the claim submitted to AIG and informing the Ex-Agents that James "Jimmy" Dukes of the law offices of Clark, Dukes, Blakeslee, Ramsay & Hammond had been retained to defend them. AIG reserved all rights under the policy and specifically informed the Ex-Agents that the policy would not apply to any wrongful act which occurred while the Ex-Agents were not employed by LPL. Additionally, AIG requested the dates the Ex-Agents became associated with LPL and a detailed narrative explaining the roles of the Ex-Agents in the complained- of transactions.

9

¶16.    On August 18, 1998, Dukes met with the Ex-Agents and their attorney Buddy Gunn. At this meeting, it was decided that Gunn would represent the Ex-Agents, while Dukes remained "on standby." Gunn informed Dukes that there was a potential conflict in Dukes's representation of the Ex-Agents, as Dukes previously had represented Columbia.

¶17.    On August 20, 1998, TELS sent written notification to each of the Ex-Agents stating that, after reviewing the claims materials submitted on behalf of the Ex-Agents, Columbia had concluded the Ex-Agents were not covered under their prior Columbia policies. The notification stated that the decision to deny coverage was based on the following factors: (1) the Ex-Agents' contracts with Minnesota Life had been terminated, (2) the Ex-Agents currently had "Professional Liability coverage through another carrier," and (3) the Ex-Agents' current carrier had retained counsel to represent the Ex-Agents. Because Columbia found the Ex-Agents to have "Professional Liability coverage in force" through another carrier, Columbia opined the Ex-Agents were not eligible for coverage under the Extended Claim Reporting Period of their previous terminated policy issued by Columbia. The TERMINATED INSURED - ERP Endorsement[7] states that:

> In consideration of the premium charged, it is hereby understood and agreed that upon termination, during the Policy Term or any Renewal thereof, of a contract of an Agent who was an **Insured** under this policy, said **Insured** shall have an automatic **Extended Claim Reporting Period** to report **Claims** *(as long as this policy or a renewal thereof is in force)* but only for **Wrongful Acts** which occur prior to the termination of the Agent's contract and only if

---

[7] See Endorsement No. 5 in the 1997 Policy and Endorsement No. 4 in the 1998 Policy.

10

there is no other Life Insurance Agent's Professional Liability *coverage in force*.

All other terms, conditions and exclusions of this policy remain the same.

(Emphases in original and added.) Columbia also stated that the denial was based on the information it currently possessed through its investigation, but if the Ex-Agents believed Columbia had reached the conclusion in error, the Ex-Agents could request that the claim be reevaluated. The Ex-Agents forwarded the denial letter to AIG.

¶18.    On August 25, 1998, Dukes sent Gunn a letter memorializing Gunn's concern with potential conflicts of Dukes's representation of the Ex-Agents and Gunn's recent request that neither Dukes nor AIG communicate with Columbia regarding these concerns.

¶19.    On September 9, 1998, the Ex-Agents responded to AIG's August 14, 1998, correspondence which requested the dates the Ex-Agents had become associated with LPL. The Ex-Agents provided their dates of employment and also stated that "[t]he investment product, which is the subject of this dispute, is not authorized nor approved by LPL." On the same day, the Ex-Agents provided TELS with a copy of AIG's August 14, 1998, reservation-of-rights letter.

¶20.    On September 25, 1998, Dukes again corresponded with Gunn, confirming that the Ex-Agents did not wish Dukes to take any further action in the matter. Dukes advised Gunn that AIG wanted to make sure all obligations to the Ex-Agents were met and was awaiting further information from Gunn as to how to proceed on the matter.

11

¶21.    On October 14, 1998, the Ex-Agents filed cross-claims against Minnesota Life, a Columbia insured and policyholder of the Ex-Agents' Columbia policies, alleging, *inter alia*, counts of breach of duty to defend, breach of contract, and damage to reputation. The Ex-Agents did not allege any vicarious liability against Minnesota Life. Minnesota Life did not forward the cross-claims to TELS, nor did it request Columbia to defend it on the cross-claims.

¶22.    On October 27, 1998, AIG contacted Gunn and informed him that AIG was withdrawing its position that coverage was available to the Ex-Agents under the AIG Policy because the alleged acts occurred while the Ex-Agents were not employed by LPL. According to AIG's notes regarding the conversation with Gunn, Gunn agreed with the coverage evaluation and noted his concern about Dukes representing the Ex-Agents due to his prior representation of Columbia. Gunn informed AIG that he believed Columbia had improperly denied coverage to the Ex-Agents and that he would vigorously defend his clients.

¶23.    After learning that AIG had withdrawn its coverage, Columbia asserted that the Ex-Agents did not communicate again with TELS or Columbia until November 10, 1999, more than one year after AIG withdrew coverage, when the Ex-Agents first alerted TELS that AIG was no longer providing them coverage or representation. The Ex-Agents stated they had been required to hire legal representation at their own cost to defend against the numerous lawsuits. The Ex-Agents then informed TELS that they had been sued in five additional

12

lawsuits and forwarded copies of those summonses and the first page of each new complaint to TELS. The Ex-Agents requested that Columbia reconsider its coverage position in light of AIG's denial of coverage. On November 22, 1999, TELS requested that the Ex-Agents provide it with complete copies of the five new complaints and a copy of AIG's denial letter. TELS sent a followup letter on December 3, 1999, again requesting copies of the newly filed complaints and the AIG denial letter. On December 15, 1999, the Ex-Agents finally complied with TELS's request, providing the requested documentation.

¶24.    Based on this new information, Columbia reviewed the Ex-Agents' claim for coverage. In a January 11, 2000, pre-claims committee meeting, Columbia discussed the Ex-Agents' position that the ERP applied when other E&O insurance did not apply to a specific claim. However, Columbia maintained the position that its policy language specifically stated "in force" and did not make a provision for the policy "in force" to apply to a particular claim. Columbia acknowledged that AIG had withdrawn coverage, but Columbia also acknowledged that the AIG policy was not rescinded, and the Ex-Agents still had an AIG policy "in force." Therefore, Columbia once again opined that the Ex-Agents were not entitled to either defense or indemnity coverage. Columbia informed the Ex-Agents that, because their Columbia policy had terminated on February 2, 1998, and because they currently had professional liability coverage through another carrier, coverage was not available to the Ex-Agents. Columbia, citing the ERP, stated that "terminated Minnesota Mutual Agents are provided with an Extended Reporting Period if there is no other

13

'Professional Liability coverage in force.'" TELS again informed the Ex-Agents that if they believed Columbia's denial of their coverage was incorrect, the Ex-Agents were to provide any additional documents and/or information, and Columbia would reevaluate its claim.

¶25. On March 27, 2000, TELS learned that the Ex-Agents had filed cross-claims against Minnesota Life because Minnesota Life had denied tender of their defense. Minnesota Life and its broker, AON, disagreed with Columbia's denial of the Ex-Agents' claims of coverage, stating that Columbia should be providing the Ex-Agents with a defense due to the terms of their policies, especially after AIG withdrew coverage and representation. Minnesota Life also informed Columbia that it believed the Ex-Agents would sue Columbia based on coverage being available pursuant to the ERP.

¶26. Subsequently, Columbia and TELS considered Minnesota Life's request that Columbia reconsider its position and Minnesota Life's belief that the Ex-Agents would most likely sue Columbia based on a denial of coverage. Following Minnesota Life's request "that [Columbia] reconsider its position on the policy's ERP," Columbia agreed to "rescind the disclaimer" and to assume the defense of the Ex-Agents. Columbia decided to retain Ken Adcock of Hickman, Goza and Gore to defend the Ex-Agents based on his knowledge of the Gulley matter.

¶27. TELS notified both the Ex-Agents and Minnesota Life that Columbia had reconsidered its previous position and would assume the defense of the Ex-Agents. In a subsequent conversation, TELS informed the Ex-Agents that Columbia would not pay for

the Ex-Agents' cross-claim filed against Minnesota Life because such claims were not covered under the Columbia policies.

¶28. On May 17, 2000, the Ex-Agents sent a written acceptance of Columbia's defense and indemnification in the nine underlying lawsuits. The Ex-Agents requested that Columbia reimburse the Ex-Agents for all fees incurred and owing to their attorney, Buddy Gunn, who had been representing the Ex-Agents for two years. The Ex-Agents stated that they did not agree to be represented by Adcock but, instead, chose to continue to retain Gunn. The Ex-Agents claimed a conflict existed between Adcock and Minnesota Life in light of the Ex-Agents' current cross-claim against Minnesota Life, which the Ex-Agents stated they would continue to pursue. The Ex-Agents believed Minnesota Life had a nondelegable duty to defend and indemnify them in the nine lawsuits, and the Ex-Agents did not feel Columbia should have to bear the entire expense associated with the litigation.

¶29. Columbia agreed to pay reasonable and necessary defense costs not paid by AIG and requested statements for services rendered and fees incurred to be provided to Columbia for review. Although Columbia did not agree that there was a conflict with Adcock representing the Ex-Agents, Columbia stated it would pay the reasonable and necessary fees of mutually-agreed-upon representation for the Ex-Agents. Columbia stated that it would not reimburse the Ex-Agents for any fees associated with their cross-claims against Minnesota Life because Columbia's coverage allowed for reimbursement of fees only in suits brought against their insureds, not in claims brought by the insureds. Columbia also requested that the Ex-Agents

15

consider dismissing their cross-claims against Minnesota Life so as to have a "unified defense." Columbia stated that it was relinquishing the ERP provision as a basis of its denial of the Ex-Agents' claims, and Columbia's payment of defense costs would be subject to a full reservation of rights.

¶30.    In a July 6, 2000, conversation between TELS and Gunn, Gunn indicated that he would not work for an insurance company and recommended that Al Hopkins of Hopkins, Crawley, Bagwell & Upshaw be retained to defend the Ex-Agents. The Ex-Agents agreed to being represented by Hopkins, and Columbia retained Hopkins to defend the Ex-Agents on July 7, 2000. On August 7, 2000, TELS sent a letter to the Ex-Agents confirming Columbia's defense under a reservation of rights and agreement to the Ex-Agents' choice of counsel, Hopkins. The letter also confirmed that the nine claims would be treated as interrelated wrongful acts and that a single limit would be shared by all Ex-Agents.[8]

---

[8] Section III D of the policies stated that:

For the purposes of determining the Insurer's Limit of Liability, all **Claims** against all **Insureds** caused by a series of continuous, repeated or interrelated **Wrongful Acts** shall be considered:
1.    As caused by one **Wrongful Act**; and
2.    Only one limit shall apply to all **Insureds**; and
3.    Such limit shall be the limit in effect at the time the first **Claim** is made.

(Emphasis in original.)

¶31.    On October 30, 2000, the Ex-Agents, through their attorney Gunn, filed a Third Party Complaint against Columbia based on its denial of coverage. On January 3, 2001, Minnesota Life filed a cross-claim against the Ex-Agents and against Columbia. Minnesota Life's cross-claim against the Ex-Agents alleged a breach of duty to advise Minnesota Life of Gulley's misappropriation of client funds and to disclose all evidence of Gulley's wrongdoing. Minnesota Life's cross-claim against Columbia alleged that Columbia improperly denied coverage to the Ex-Agents, which in turn led to the Ex-Agents' suit against Minnesota Life. The cross-claim did not allege that Columbia wrongfully denied providing a defense for Minnesota Life.

¶32.    On March 26, 2001, the Ex-Agents settled their claims with Minnesota Life for $9,000,000. As part of their settlement, Minnesota Life assigned a portion[9] of its interest in its claims and causes of action against Columbia to the Ex-Agents.

¶33.    Between March 2001 and May 2001, Minnesota Life settled all claims in the nine underlying lawsuits. Minnesota Life never sought Columbia's consent to settle any of the claims, including those brought by the Ex-Agents, nor did Minnesota Life notify Columbia of the settlements. The Ex-Agents did not contribute any money to settle the underlying claims.

---

[9] The record does not reflect how much of Minnesota Life's interest was assigned to the Ex-Agents.

¶34.    On June 4, 2001, Minnesota Life, through its new counsel Buddy Gunn, filed an amended cross-claim against Columbia, alleging for the first time that Minnesota Life, like the Ex-Agents, was entitled to a defense and indemnity by Columbia as an insured for covered conduct and/or incidents related to the nine lawsuits.

¶35.    On June 11, 2001, Minnesota Life entered into a Consent Order with the Mississippi Secretary of State, admitting that it "failed reasonably to supervise its agent in that there was no adequate supervisory review of C. Douglas Gulley, Jr., for the period from 1989 through 1998" and that it "failed to establish or implement adequate supervisory procedures and such failure allowed C. Douglas Gulley, Jr., to violate numerous laws and rules and commit fraud and embezzlement of approximately 3.5 million dollars over a period of at least nine (9) years without detection." Minnesota Life agreed to pay $550,000 in penalties, costs, and expenses.

¶36.    In October 2000, Hopkins was paid for the first bills submitted by his firm to TELS. Hopkins submitted another bill in February 2001. There was discussion between Hopkins and TELS regarding expenses that Columbia would not pay and the date by which the approved fees and expenses would be paid. Hopkins sent a third bill on April 25, 2001. The day before he submitted his third bill to TELS, Hopkins contacted the Ex-Agents, stating he had two outstanding bills and had yet to be paid by Columbia. He informed the Ex-Agents that, as his clients, they would be responsible for paying his bills since TELS had not. On May 1, 2001, each Ex-Agent paid Hopkins $25,000. The next day, the Ex-Agents secured a loan in the

amount of $100,000. On May 4, 2001, after learning that Hopkins had requested payment from "his clients," TELS immediately corresponded that Hopkins's first bill had been paid seven months prior, his second bill would be paid by May 11, per their earlier conversation, and the third bill had just been received but likely would be paid by the end of the month. TELS advised Hopkins that "his clients" were not responsible for his bills and he should inform them so immediately. On May 7, 2001, Hopkins informed TELS that the Ex-Agents already had paid him $100,000 but he would inform the Ex-Agents that they did not need to pay his remaining balance. On May 9, 2001, TELS again instructed Hopkins to advise "his clients" that they were not responsible for his bills. On June 5, 2001, after receiving payment from Columbia for his bills, Hopkins reimbursed the Ex-Agents the $100,000 paid by them for his bills. The Ex-Agents did not pay back the loan until July 2001.

¶37. On May 3, 2010, almost ten years after Columbia agreed to reimburse the Ex-Agents' attorneys fees not paid by AIG, Gunn submitted to Columbia itemized statements of all fees and costs his clients incurred in litigation from July 1998 until May 2001. On May 27, 2010, Columbia paid Gunn the amount of his bills up until July 7, 2000, the day on which Hopkins was hired to defend the Ex-Agents. Part of the bills paid included costs incurred in filing suit against Minnesota Life, even though Columbia previously had stated it would not reimburse Gunn for those expenses, as they were not recoverable under the policy.

¶38. On May 11, 2011, all parties filed motions for summary judgment. The Ex-Agents and Minnesota Life argued (1) Columbia had breached its duty to defend the Ex-Agents by twice

19

refusing to defend the Ex-Agents under the policies and/or failing to resolve ambiguities in the policies in favor of the Ex-Agents; (2) Columbia had breached its duty to defend the Ex-Agents by twice refusing to defend the Ex-Agents under the excess insurance coverage provision and/or by failing to advise the Ex-Agents of this provision; (3) Columbia had failed to comply with its obligation to pay the fees and expenses incurred by the Ex-Agents' *Moeller*[10] counsel; (4) Columbia's refusal to defend the Ex-Agents entitled them to recover all foreseeable damages; and (5) Columbia's conduct was of such an egregious nature that punitive damages were warranted. Additionally, in its motion for partial summary judgment, Minnesota Life argued (1) Columbia had a contractual duty to defend Minnesota Life and the Ex-Agents; (2) Minnesota Life was an intended beneficiary of Columbia's contractual duty to defend the Ex-Agents; (3) Columbia had breached its duty of good faith and fair dealing to Minnesota Life; and (4) Minnesota Life was entitled to punitive damages and/or extra contractual damages.

¶39.    As to the Ex-Agents, Columbia argued that (1) Columbia did not breach any contractual obligations owed to the Ex-Agents; (2) no coverage was provided by the policies because the Ex-Agents had other coverage in force through AIG; (3) the Ex-Agents were not damaged as a result of any alleged breach; and (4) Columbia consistently had acted in good faith. As to Minnesota Life, Columbia argued that (1) Minnesota Life was not an insured; (2) Minnesota Life was an additional insured and was covered only in very limited

---

[10] *Moeller v. Am. Guar. & Liab. Ins. Co.*, 707 So. 2d 1062 (Miss. 1996).

20

circumstances; (3) Minnesota Life was not covered because claims of independent negligence and bad faith were alleged against Minnesota Life; (4) Minnesota Life breached conditions of the policies by never providing notice of the claims, requesting a defense from Columbia, requesting Columbia's consent to any settlement, or sending defense invoices to Columbia and, therefore, forfeited any coverage; (5) Minnesota Life did not qualify as a third-party beneficiary because it was named an additional insured in the policy; and (6) Columbia consistently had acted in good faith.

¶40. Additionally, on June 3, 2011, the Ex-Agents and Minnesota Life filed a motion to strike, moving the court to strike and/or disregard the affidavits and exhibits offered by Columbia in support of its motions for summary judgment and in defense of the motions for summary judgment filed by the Ex-Agents and Minnesota Life, as they were inadmissible, immaterial and/or irrelevant.

¶41. On June 30, 2011, after hearing oral argument on the Ex-Agents' and Minnesota Life's Motion to Strike, the court held that all exhibits and affidavits were properly before the court. As such, the trial court denied the Ex-Agents' and Minnesota Life's Motion to Strike.

¶42. At the same hearing, the trial court also heard argument on the parties' motions for summary judgment. After considering the parties' arguments and the "thousands of pages of documents exchanged between the parties," the trial court granted Columbia's motions for summary judgment. The trial court determined that there was no evidence that Columbia had

21

breached the terms of the applicable policies as to the Ex-Agents or as to Minnesota Life. The court held that Columbia did not act in bad faith in its denial of Ex-Agents' claims, because, at the time of the initial denial, the Ex-Agents were not employed by Minnesota Life, claims against the Ex-Agents were made after the 1997 Policy was terminated, some of the alleged conduct occurred after the Ex-Agents' 1997 Policy was terminated, the Ex-Agents had coverage in force through AIG,[11] and the Ex-Agents were being defended under the AIG policy. Likewise, the court held that Columbia did not act in bad faith in its denial of coverage for Minnesota Life because Columbia's duty to defend was never triggered as to Minnesota Life. It held that, Minnesota Life was not an insured under the policy. The limited coverage provided to Minnesota Life as an additional insured covered only claims under the theory of vicarious liability, and the nine complaints clearly alleged individual negligence on the part of Minnesota Life. Additionally, the trial court found that Minnesota Life never had tendered the matter to Columbia to provide a defense.

## ISSUES

¶43.    On appeal, the Ex-Agents and Minnesota Life raise the following issues, restated:

   I.    Whether the trial court's denial of the Ex-Agents' and Minnesota Life's Motion to Strike was an abuse of discretion.

   II.   Whether the trial court erred in denying the Ex-Agents' Motion for Summary Judgment and/or in granting Columbia's Motion for Summary Judgment as to the Ex-Agents' claims.

_____

[11] As stated *supra*, this finding of the trial court is erroneous. This Court disturbs no other findings made by the trial court.

22

III.    Whether the trial court erred in denying Minnesota Life's Motion for Summary Judgment and/or in granting Columbia's Motion for Summary Judgment as to Minnesota Life's claims.

## ANALYSIS

### I.    Motion to Strike

¶44.    The Ex-Agents and Minnesota Life argue that the trial court erroneously denied their motion to strike various affidavits and exhibits submitted by Columbia in  support of its motions for summary judgment and in defense of the Ex-Agents' and Minnesota Life's motions for summary judgment.

¶45.    A trial court's denial of a motion to strike an affidavit is subject to an abuse-of-discretion standard of review. ***Trustmark Nat'l Bank v. Meador***, 81 So. 3d 1112, 1116 (Miss. 2012) (citing ***Schmidt v. Catholic Diocese of Biloxi***, 18 So. 3d 814, 832 (Miss. 2009)). Pursuant to Mississippi Rule of Civil Procedure 56(e), "[s]upporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matter stated therein." Miss. R. Civ. P. 56(e). "While most affidavits are hearsay, they are nevertheless properly considered on summary judgment motions as long as they are based on personal knowledge and set forth facts such as would be admissible in evidence." ***Levens v. Campbell***, 733 So. 2d 753, 758 (Miss. 1999) (citations omitted).

¶46.    After hearing arguments from the parties, the trial court overruled the motion to strike, finding the affidavits and exhibits to be admissible. This Court finds that the affidavits

23

comply with the requirements of Rule 56(e). The affidavits were based on sufficient, personal knowledge and provide relevant, admissible evidence which the trial court properly considered in ruling on the motions for summary judgment. Therefore, this Court finds that the trial court did not abuse its discretion in denying the Motion to Strike.

## II. Summary Judgment as to the Ex-Agents' Claims

¶47. "The interpretation of an insurance policy is a question of law, not one of fact." *Noxubee County Sch. Dist. v. United Nat'l Ins. Co.*, 883 So. 2d 1159, 1165 (Miss. 2004) (citing *Lewis v. Allstate Ins. Co.*, 730 So. 2d 65, 68 (Miss. 1998)). "[W]hen a question of law is raised, we apply a de novo standard of review." *Delashmit v. State*, 991 So. 2d 1215, 1218 (Miss. 2008) (citation omitted).

¶48. Insurance policies are contracts and must be enforced according to their provisions. *Noxubee County*, 883 So. 2d at 1166 (citing *United States Fid. & Guar. Co. v. Knight*, 882 So. 2d 85, 92 (Miss. 2004)). Contractual parties making mutual promises must be entitled to the benefit of their bargain. *Noxubee County*, 883 So. 2d at 1166. "[I]n interpreting an insurance policy, this Court should look at the policy as a whole, consider all relevant portions together and, whenever possible, give operative effect to every provision in order to reach a reasonable overall result." *J & W Foods Corp. v. State Farm Mut. Auto Ins. Co.*, 723 So. 2d 550, 552 (Miss.1998) (citing *Cont'l Cas. Co. v. Hester*, 360 So. 2d 695, 697 (Miss. 1978)). "A court must effect a determination of the meaning of the language used, not

24

the ascertainment of some possible but unexpressed intent of the parties." ***Cherry v.***

***Anthony, Gibbs, Sage***, 501 So. 2d 416, 419 (Miss. 1987).

> Generally, under Mississippi law, when the words of an insurance policy are plain and unambiguous, the court will afford them their plain, ordinary meaning and will apply them as written. ***Paul Revere Life Ins. Co. v. Prince***, 375 So. 2d 417, 418 (Miss. 1979). Under Mississippi law, ambiguous and unclear policy language must be resolved in favor of the non-drafting party – the insured. ***Harrison v. Allstate Ins. Co.***, 662 So. 2d 1092, 1094 (Miss. 1995). Further, provisions that limit or exclude coverage are to be construed liberally in favor of the insured and most strongly against the insurer. ***Nationwide Mut. Ins. Co. v. Garriga***, 636 So. 2d 658, 662 (Miss. 1994).

***Noxubee County***, 883 So. 2d at 1165.

### A.    Policy Language

¶49.    There are two types of professional liability insurance policies: "occurrence" policies and "claims-made" policies. ***Jones v. Baptist Mem'l Hosp.-Golden Triangle, Inc.***, 735 So. 2d 993, 999 (Miss. 1999). "A 'claims made' policy protects the holder only against claims made during the life of the policy, while an 'occurrence' policy protects the policyholder from liability for any act done while the policy is in effect." ***St. Paul Fire & Marine Ins. Co. v. Barry***, 438 U.S. 531, 535 n.3, 98 S. Ct. 2923, 57 L. Ed. 2d 932 (1978). "Claims-made" policies cover only those losses caused by "wrongful action taking place at any point in time *as long as the claim is made during the period the policy is in effect.*" ***Jones***, 735 So. 2d at 1000 (emphasis in original). Conversely, "occurrence" policies will cover all wrongful acts which occurred during the term of the policy "even if a claim is made . . . after expiration of

25

the policy *if the wrongful act took place while such policy was in effect*." ***Id.*** (emphasis in original).  *See also* 42 Am. Jur. 2d *Insurance* § 2 (1982).

¶50.　The starting point for interpreting an insurance contract or policy is the language of the policy itself. The policies at issue were "claims-made" policies. The 1997 Policy provides coverage only for claims made prior to the termination of the policy. Based upon the specific language of the policy, the policy applied to all claims made against the insured during the policy period, March 1, 1997, through March 1, 1998, unless the Extended Claim Reporting period applies. It is undisputed that no claims were made under this policy prior to its termination. Therefore, there is no coverage *unless* the Extended Claim Reporting Period is applicable. According to the policy language, the Extended Claim Reporting Period for the terminated Ex-Agents shall apply as long as (1) the specific policy or a renewal of the policy is in force, (2) the wrongful acts occur prior to the termination of the Ex-Agents' contract, and (3) there is no other "coverage in force."

¶51.　There is no doubt that Minnesota Life renewed the 1997 Policy for the term of March 1, 1998, through March 1, 1999. There is no doubt that the complained-of wrongful acts alleged in the nine underlying complaints occurred prior to the termination of the Ex-Agents' contracts with Minnesota Life. Therefore, this Court is left to determine if the Ex-Agents had "coverage in force" through AIG.

¶52.　Throughout this entire litigation, the Ex-Agents and Minnesota Life have contended that the ERP provides coverage because the AIG policy did not provide coverage to the Ex-

26

Agents for alleged wrongful acts occurring while they were Minnesota Life agents. Because coverage was denied by AIG, the Ex-Agents contend that Columbia should have concluded that there was no coverage in force. Columbia, however, contends that "coverage" is synonymous with "policy" and that it does not matter what type of "coverage" is provided under that "policy," as long as the Ex-Agents have a "policy in force."

¶53.    Reviewing the entire Columbia policy, there are numerous instances where the terms "insurance," "policy," "claim," "coverage," and "in force" are used: "valid and collectible *insurance* available," "other *insurance* against a *claim covered* by this *policy*," "same or similar *policy*," "*claim* arising out of a wrongful act," "master *policy* remains *in force*," "as long as this *policy* . . . remains *in force*," "*coverage in force*," "*insurance in force* which would apply to a *claim* also *covered* by this *policy*," and "*coverage* will not extend to . . . any *claim*." While policy language clearly makes distinctions between these words, Columbia argued that all were synonymous.

¶54.    While "ambiguities in insurance policies should be construed in favor of the insureds," we are of the opinion the policy in question is unambiguous. "It is well settled that the words of a contract are to be given their ordinary meanings." ***Cont'l Cas. Co. v. Hester***, 360 So. 2d 695, 697 (Miss. 1978) (citing ***Ferguson v. Provident Life & Accident Ins. Co.***, 170 Miss. 504, 155 So. 168 (1934)). "It is axiomatic that all provisions of an insurance policy must be so construed, if possible, to give effect to each." ***Cont'l Cas. Co.***, 360 So. 2d at 697 (citing ***Southern Home Ins. Co. v. Wall***, 156 Miss. 865,  127 So. 298, 299 (1930)).

27

¶55. The key to the meaning of the phrase "coverage in force" is the word "coverage." "Coverage" can be defined as the "extent of protection afforded by an insurance policy." *Webster's II New College Dictionary* 261 (2001). Insurance policies provide different types of coverage depending on the particular policy. Coverage applies to losses, damages, or claims afforded by an insurance policy. It is more than obtaining an insurance policy. One must look to the actual policy obtained to determine what coverage is in force.

¶56. The Ex-Agents had coverage under the ERP endorsement for the underlying claims as long as they had no other coverage in force for those same alleged wrongful acts. The AIG policy did not provide coverage for wrongful acts that occurred while the Ex-Agents were employed by Minnesota Life and covered by Columbia; it covered acts only while the Ex-Agents were employed by LPL. The Ex-Agents were covered by the ERP endorsement of the Columbia policies for the wrongful acts alleged in the underlying claims, because they had no other "coverage in force" for those alleged wrongful acts which occurred before they were employed by LPL.

## B. Duty to Defend

¶57. Finding that the Ex-Agents were covered under the Columbia policies, this Court must now determine if a duty to defend was triggered and, if so, if Columbia breached its duty. An insurance company's duty to defend its insureds

> derives neither from common law nor statute, but rather from the provisions of its policy, that is, its insurance contract with its insured. It is a matter of contractual agreement. Absent a higher obligation created by statute, an insurance company's duty to defend is neither greater nor broader than the

28

duty to comply with its other contractual obligations. That is not to say an insurance company can ignore its duty to defend where it has agreed to defend its insureds for covered claims, and the allegations of a complaint reasonably bring a claim within the coverage of its policy. The duty of good faith and fair dealing attends all contracts interpreted under Mississippi law. *See* Miss. Code Ann. § 75-1-203; *University of Southern Mississippi v. Williams*, 891 So. 2d 160, 170 (Miss. 2004).

*Baker Donelson Bearman & Caldwell, P.C. v. Muirhead*, 920 So. 2d 440, 450-51 (Miss. 2006). Under Mississippi law, the determination of whether an insurance company has a duty to defend depends upon the language of the policy as compared to the allegations of the complaint in the underlying action. *See U.S. Fid. & Guar. Co. v. Omnibank*, 812 So. 2d 196, 200 (Miss. 2002); *Delta Pride Catfish, Inc. v. Home Ins. Co.*, 697 So. 2d 400, 403 (Miss. 1997); *State Farm Mut. Auto. Ins. Co. v. Taylor*, 233 So. 2d 805, 808 (Miss. 1970). "An insurance company's duty to defend its insured is triggered when it becomes aware that a complaint has been filed which contains reasonable, plausible allegations of conduct covered by the policy. However, no duty to defend arises when the claims fall outside the policy's coverage." *Baker Donelson*, 920 So. 2d at 451. *See also Farmland Mut. Ins. Co. v. Scruggs*, 886 So. 2d 714, 719 (Miss. 2004); *Sennett*, 757 So. 2d at 212; *Delta Pride Catfish*, 697 So. 2d at 403; and *Moeller*, 707 So. 2d at 1069.

¶58.    Each of the nine underlying complaints alleged that the conduct complained of occurred while the Ex-Agents were employed by Minnesota Life. Specifically, the complaints alleged that the Ex-Agents should have known of the intentional taking of the plaintiffs' money and that the Ex-Agents should have notified the proper authorities about

29

the taking of the money. On the face of the complaints, which were provided to TELS and Columbia, there are "reasonable, plausible allegations of conduct" which are covered under the Columbia policies. Therefore, Columbia's duty to defend the Ex-Agents was triggered upon receipt of the complaints.

¶59.    Because Columbia failed to defend the Ex-Agents upon receipt of the complaints, Columbia breached its duty to defend. When an insurer, such as Columbia, makes the decision to refuse to provide a defense to its insured, "it runs a substantial risk of a later determination that a defense should have been provided. Such decisions, absent an arguable, reasonable basis, can result in a finding of bad faith," which would result in a jury question. *Baker Donelson*, 920 So. 2d at 451, *Indem. Ins. Co. of N. Am. v. Guidant Mut. Ins. Co.*, 99 So. 3d 142, 153 (Miss. 2012).

¶60.    The trial court granted summary judgment in favor of Columbia as to the Ex-Agents' claims based on its acceptance of Columbia's interpretation of the policy language. Columbia proffered testimony that its interpretation was accepted in the industry. The Ex-Agents presented an opposing view.[12] Columbia's interpretation was accepted by the trial court. We find that the grant of summary judgment on the basis of the Ex-Agents having coverage in

---

[12] The Ex-Agents cited no cases in which this Court, or any other court, has addressed the issue of the meaning of "coverage in force." In this matter of first impression, the trial court, on remand, may consider that as a factor, if necessary, when determining whether Columbia acted in bad faith.

force through AIG was erroneous. Therefore, the summary judgment on that issue is reversed and the case is remanded for further proceedings consistent with this opinion.

¶61. Because the trial court granted Columbia's motion for judgment based on an erroneous interpretation of the policy, the trial court did not address whether the Ex-Agents had a compensable injury, and if so, whether Columbia acted in bad faith, such that an award of punitive damages was warranted. A denial of a claim based upon an erroneous interpretation of policy language does not automatically equate to bad faith, if there was an arguable or legitimate basis for the denial or if Columbia had relied upon advice of counsel. See *Jenkins v. Ohio Cas. Ins. Co.*, 794 So. 2d 228, 232-33 (Miss. 2001).

¶62. On remand, the trial court should consider whether the Ex-Agents have proven a compensable injury such that a jury could properly award damages above any amount the Ex-Agents already have been paid.[13] If the trial court determines that the Ex-Agents are entitled to compensable damages, above what the Ex-Agents already have received, the trial court must then determine whether Columbia additionally lacked an "arguable or legitimate basis"

---

[13] The Ex-Agents cannot recover the same damages twice and can recover only if damages are proven in excess of the amounts they already have been paid. "It is well known that this state does not endorse double recovery. . . . Double recovery is a tort doctrine that prevents unjust enrichment by precluding a recovery of the same damages multiple times. . . ." *R.K. v. J.K.*, 946 So. 2d 764, 777 (Miss. 2007) (citing *Medlin v. Hazlehurst Emergency Physicians*, 889 So. 2d 496, 499 (Miss. 2005)).

31

for initially denying the Ex-Agents' claims, and/or whether Columbia acted in "gross and reckless" disregard for the Ex-Agents' rights.

> The issue of punitive damages should not be submitted to the jury unless the trial court determines that there are jury issues with regard to whether:
> 1. The insurer lacked an arguable or legitimate basis for denying the claim, and
> 2. The insurer committed a wilful or malicious wrong, or acted with gross and reckless disregard for the insured's rights.

*Jenkins*, 794 So. 2d at 232-33. If the trial court determines that Columbia's actions rose to this level, only then may the Ex-Agents present their bad-faith claim to a jury.

### III. Summary Judgment as to Minnesota Life's Claims

¶63. There is no question that Minnesota Life was the named policyholder, and thus an insured, under both the 1997 and 1998 Policies. Minnesota Life's coverage, however, was limited to "vicarious liability coverage-defense costs only." Under Coverage Agreement B, which is the defense-cost provision, Columbia had the

> right and duty to defend any **Claim** or suit against the **Insured** seeking sums payable under this Insurance, even if any of the allegations of the suit are groundless, false or fraudulent. The Insurer may make such investigation and with the written consent of the **Insured**, make settlement of any **Claim** as it deems expedient, but the Insurer shall not be obligated to pay any **Claim** or judgment or to defend any **Claim** or judgment or to defend any **Claim** or suit after the applicable limit of the Insurer's liability has been exhausted by payment of judgments or settlements.

(Emphasis in original.) Coverage B comes into play only when Minnesota Life "is named as a co-defendant in a **Claim** against the **Insured** due to a **Wrongful Act** attributable *solely to an **Insured**/Agent and not due to an independent negligence or bad faith of Minnesota Mutual Life Insurance Company. . . .*" (Emphases in original and added.)

¶64. It is uncontested that the underlying complaints each contained allegations of independent negligence on the part of Minnesota Life. Minnesota Life argues that, because the complaints also contain claims in which negligence is attributable solely to the Ex-Agents, the vicarious liability coverage is applicable. Minnesota Life bases its argument on the Policy provision's language of "a claim," which it contends relates to any claim in the complaint; i.e., if any claim in the complaint solely attributes negligence to the Ex-Agents, then Minnesota Life is covered under the policy–regardless of whether a claim of independent negligence is alleged on the part of Minnesota Life. Columbia counters that the "attributable solely" language indicates that all of the allegations in the complaints must be based on the Ex-Agents' independent negligence with no allegations of any negligence attributable to Minnesota Life.

¶65. A clear reading of the policy language, giving words their ordinary meaning, indicates that Minnesota Life is covered only if the underlying complaints attribute no independent negligence to Minnesota Life. It is uncontested that the nine underlying complaints allege independent negligence and bad faith on the part of Minnesota Life. Therefore, based on the allegations in the complaint as compared with the language of the policy, Columbia's duty to defend Minnesota Life was never triggered because the allegations in the complaints fell outside the policy. No "reasonable, plausible allegation of conduct" was covered by the policy.

¶66. Even if Minnesota Life was able to prevail as to its argument that it was covered under the policies, Minnesota Life failed to comply with the requirements of the policies. The Assistance and Cooperation Condition of the policies specifically states that "[t]he **Insured** *shall not, except at their own cost, voluntarily make any payment, assume any obligation or incur any expense.*" (Emphases in original and added.) On its own, without consultation with or consent from Columbia, Minnesota Life settled the nine underlying claims, paid settlement monies to the Ex-Agents, paid fines to the Secretary of State, and incurred attorneys' fees and costs from three separate law firms. Minnesota Life is now arguing that Columbia is responsible not only for its defense costs, but all costs incurred by Minnesota Life. Minnesota Life argues that if Columbia breached its duty to defend under the policies, Columbia cannot now claim protection under the policies.

¶67. In the same vein, if Minnesota Life failed to comply with the requirements of the policies, it cannot claim protection either. The policies strictly forbid voluntary payment of any kind.

> In *Southwest Mississippi Electric Power Association v. Harragill*, 254 Miss. 460, 468, 182 So. 2d 220, 223 (1966), this Court held that to recover indemnity the indemnitee must allege and prove that he was legally liable to the person injured and, consequently, paid under compulsion; otherwise, the payment was in law a voluntary one for which there could be no recovery in an indemnity action. *Bush v. City of Laurel*, 215 So. 2d 256, 260 (Miss. 1968), proceeds on the same premise, holding that a payment made after liability has been established is one made under compulsion. *Hopton Building Maintenance, Inc. v. United Parcel Service, Inc.*, 559 So. 2d 1012, 1014 (Miss. 1990), is to like effect. *Maryland Casualty Co. v. R.H. Lake Agency, Inc.*, 331 F. Supp. 574 (N.D. Miss. 1971), perceptively applies Mississippi law to the point.

***Keys v. Rehab. Centers, Inc.***, 574 So. 2d 579, 584 (Miss. 1990). Our general rule is that "an indemnitee must prove payment under *compulsion* and *reasonableness in amount* before he may recover." ***Id***. at 585 (citing ***Hopton Bldg. Maint., Inc.***, 559 So. 2d at 1014).

¶68.    Minnesota Life cannot show that any payments, fines, or settlements paid were compulsory or that the exorbitant amount paid was reasonable. Minnesota Life voluntary paid money without ever consulting Columbia. Minnesota Life cannot now claim foul on Columbia's part and obtain contribution. As such, we find that the grant of summary judgment in favor of Columbia was proper.

## CONCLUSION

¶69.    "Coverage" is not broadly defined as a mere policy but instead applies to protection afforded by an insurance policy. The Ex-Agents did not have coverage under the AIG policy for the wrongful acts alleged in the underlying complaints, thus triggering the Extended Claim Reporting Period of the Columbia policies. Columbia's duty to defend the Ex-Agents under the policy was triggered upon receipt of the complaints in the nine underlying cases. Summary judgment was improperly granted in favor of Columbia as to the Ex-Agents' claims on the basis of the erroneous policy interpretation.

¶70.    Minnesota Life does not fare as well. It is clear from the underlying claims that independent wrongdoing on the part of Minnesota Life was alleged, negating its vicarious liability coverage. Columbia did not breach its duty to defend Minnesota Life, as no duty to defend ever was triggered. Additionally, the policy strictly prohibits voluntary payments. On

35

its own, Minnesota Life chose voluntarily to settle all of the claims against it by the underlying claims and the Ex-Agents without the consent of Columbia. Columbia is not liable for those voluntary payments. As such, the trial court properly granted summary judgment in favor of Columbia as to Minnesota Life's claims.

¶71. We affirm the trial court's order denying the motion to strike and its order granting summary judgment in favor of Columbia as to Minnesota Life's claim; however, we reverse the trial court's order granting summary judgment in favor of Columbia as to the Ex-Agents' claims and remand for proceedings consistent with this opinion.

¶72. **AFFIRMED IN PART; REVERSED IN PART AND REMANDED**.

**WALLER, C.J., DICKINSON, P.J., LAMAR, KITCHENS, CHANDLER, PIERCE, KING AND COLEMAN, JJ., CONCUR.**