# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

January 17, 2022

Lyle W. Cayce
Clerk

No. 20-60716

Meaghin Jordan, *Individually*; Jonathan Jordan, *Individually*; Meaghin *and* Jonathan Jordan, *on behalf of their minor son*, Braylon Jordan,

*Plaintiffs—Appellants/Cross-Appellees*,

*versus*

Evanston Insurance Company,

*Defendant—Appellee/Cross-Appellant*.

Appeal from the United States District Court
for the Southern District of Mississippi
USDC No. 3:15-CV-821

Before King, Higginson, and Wilson, *Circuit Judges*.
Cory T. Wilson, *Circuit Judge*:

When he was just about two years old, Braylon Jordan swallowed small magnets, "Buckyballs," manufactured by Maxfield & Oberton Holdings (M&O). Once ingested, the magnets shredded his internal organs, necessitating surgery to remove most of his intestines, leaving Braylon severely disabled for the rest of his life, and consigning his parents to provide near constant care for their son for the rest of theirs. This heart-rending situation comes to this court for the second time; today's appeal involves not

No. 20-60716

the merits of the Jordans' claims but a dispute over whether there is insurance coverage for M&O's defense and for a partial settlement of the Jordans' claims. The answer turns on whether a claim was made during the policy period, as necessary to trigger coverage. And the answer to that question is no. Accordingly, we REVERSE the district court's holding to the contrary and RENDER judgment in favor of the insurer.

## I.

The ordeal that Braylon Jordan and his family have endured is chronicled in this court's prior opinion in their action against M&O, *Jordan v. Maxfield & Oberton Holdings, L.L.C.*, 977 F.3d 412, 414-15 (5th Cir. 2020). Below, we lay out the procedural history particular to this dispute over coverage for M&O's costs of defense and for a partial settlement between the Jordans and M&O's then-CEO, Craig J. Zucker, reached while the Jordans' liability claims were pending.

As discovery proceeded in the underlying case, Evanston Insurance Company, one of M&O's excess liability insurers, confirmed that it denied coverage for the Jordans' claims against M&O and declined to defend M&O against the Jordans' suit. Evanston's declination led the Jordans to file this action for declaratory relief to determine whether Evanston's insurance policy, as well as several other policies held by M&O at relevant times,[1] covered their claims against M&O. The evidence adduced in this action focused primarily on three things: news reporting of Braylon Jordan's story,

---

[1] The Jordans initially sued four insurance companies: Great American E&S Insurance Company, Indian Harbor Insurance Company, Evanston, and Scottsdale Insurance Company. Great American was M&O's primary insurer during the relevant timeframe. Indian Harbor was the primary insurer after Great American's policy period lapsed. Evanston was M&O's first excess carrier, and Scottsdale was M&O's secondary excess carrier during the period. The other insurers eventually reached settlements with the Jordans, so Evanston is the only remaining defendant.

reactions to several articles by M&O and its insurers, and the insurance policies themselves.

On April 23, 2012, WWL TV in New Orleans ran an article detailing Braylon's surgeries and the dangers posed by high-powered magnets. Zucker saw this article and forwarded it, along with one about a teenager in Oregon, to M&O's primary insurer the next day. Zucker told the insurer that the "news stories were reported online involving our products. All known information about the incident are [sic] included in the story. We have no additional information nor have we been contacted directly regarding the incident." A day later M&O forwarded the WWL article to its excess insurers, including Evanston. M&O's primary insurer acknowledged receipt of Zucker's message, responding that it "reserve[d] all rights, including the right to deny coverage for this claim[.]"

For its part, Evanston opened an internal "Claim/Occurrence" file. It included an initial file notation: "Claim setup and forward to [agent] to assignment." On April 30, 2012, Evanston added a comment that it had "[r]eceived notice of the filing of a consumer complaint regarding the insured product, Buckyballs." That same day Evanston noted that it had "[r]eceived e-mail from underlying advised they have also received notice of this new loss." In June 2012, Evanston added a note to the file that stated "[n]o claim or lawsuit file[d]." In October 2012 Evanston again noted "[n]o claim or lawsuit file[d]."

Additional news articles were published about Braylon. On April 24, 2012, a Denver CBS-affiliate published an article that discussed a blood clot found in his small intestine as well as the experiences of a Colorado pediatrician who treated children who ingested magnets. On May 23, 2012, a New Orleans FOX-affiliate published an article that discussed Braylon's recovery from the surgery needed to remove the vast majority of his

intestines. CNN also published two articles, one in June and another in July 2012. The June article detailed Braylon's story and concluded by quoting his mother, Meaghin Jordan: "The Jordans, after their horrific experience with Braylon, are all for a recall. 'I would love to get them banned,' Meaghin says. 'I don't want this to happen to anyone else.'" The July article reported on M&O's history with various regulatory bodies and again quoted Meaghin Jordan as saying she was pleased that federal regulators were acting to restrict M&O's ability to market and sell the magnets.

On December 11, 2012, counsel retained by the Jordans sent M&O a demand letter. The letter "advise[d] that [counsel was] representing Braylon Jordan in his claim for personal injuries which occurred on April 1, 2012, when he swallowed eight magnetic Bucky Balls [sic] manufactured by [M&O]," and requested "a response regarding this claim from [M&O] or [its] liability insurance carrier within ten days . . . ." After M&O's counsel forwarded the Jordans' demand letter and links to several additional news articles to its insurers, including Evanston, Evanston responded in January 2013 that

> the [Jordan] claim is the first claim to be submitted that is related to [approximately 38] prior Occurrences reported to Evanston . . . . However . . . this claim does not meet the timely reporting conditions of the Evanston excess liability claims-made policy. Therefore, there is no coverage available under the Evanston policy for this matter.

M&O's various insurance policies were claims-made policies. Generally, claims-made policies provide coverage for claims made against insured parties within a defined policy period. "Under claims made policies, the mere fact that an insured loss-causing event occurs during the policy period is not sufficient to trigger insurance coverage of the loss." *FDIC v. Mijalis*, 15 F.3d 1314, 1330 (5th Cir. 1994). "Such policies also typically

require the insured to give prompt notice to the insurer of any claims asserted against the insured, as well as of any occurrences that have caused or will potentially cause an insured loss." *Id.*

The Evanston policy provided that Evanston agreed "to pay on behalf of the Insured . . . up to an amount not exceeding [Evanston's] Limit of Liability . . . as a result of claims first made against the Insured and reported to the Company during the policy period." The policy period was July 25, 2011 to July 25, 2012. Coverage was explicitly conditioned on M&O providing Evanston timely notice of any "claim or suit[.]" Specifically, M&O was obligated to provide "1) [h]ow, when and where the accident or occurrence took place; 2) [t]he Insured's name and address; 3) [t]he names and address of any injured persons and witnesses; and 4) [t]he nature and location of any injury or damage arising out of the accident or occurrence."

Because the Evanston policy was an excess policy, it also incorporated the limitations of M&O's underlying insurance policy. That policy provided that the insurer would pay amounts "that the Insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' . . . ." The underlying policy conditioned coverage on "a claim for damages" for "'bodily injury' or 'property damages' . . . [being] made against any insured . . . during the policy period . . . ." The policy provided that a claim would be deemed to have been made "when notice of such claim is received and recorded by any insured or by us, whichever comes first . . . ."

The parties ultimately filed cross-motions for summary judgment. Evanston, overlaying the provisions of its policy and M&O's underlying policy, argued in its motion that there were two baseline requirements for coverage during the policy period: (1) a claim made against M&O and (2) notice of that claim being given to the insurers. Because the Jordans had not

No. 20-60716

made a claim against M&O, and Evanston had "received no reported claim" during the coverage period, "there [was] simply no coverage for the claim[.]"

In their opposing motion for summary judgment, the Jordans did not squarely address whether they had made a timely claim against M&O but instead focused on the news articles about Braylon. They argued that M&O treated these articles as if a claim had been made against it and had then forwarded at least some of them to its insurers, notifying them of a claim. The Jordans also asserted that based on the insurers' internal references to the articles as a "claim," the insurers had treated M&O's correspondence as notice of a claim. The Jordans argued that coupling the articles with the fact that the insurers "received, recorded, and treated the Braylon Jordan matter as a 'claim' during the Policy Period" was enough to demonstrate that M&O's insurers had received notice of a claim sufficient to trigger coverage.

Shortly after the motions for summary judgment were filed, the Jordans reached an agreement with Zucker and M&O's underlying insurer to settle their claims against both. The underlying insurer tendered its policy limits, and Zucker agreed to pay an additional $20 million to the Jordans, contingent on that amount being funded by M&O's excess insurers. Evanston refused to fund this settlement.

The district court denied the parties' summary judgment motions. The court stated that "[a] trial will need to be held on whether the newspaper article[2] was a claim or an occurrence, and perhaps more importantly, whether the 2011–12 insurers should be estopped from denying coverage because they treated the newspaper article as a timely claim." After the

---

[2] The district court did not identify which "article" it was referencing.

parties later stipulated that a trial was not necessary, the district court revisited the motions based on the briefing.

The court declined to rule directly on whether any of the news articles constituted a claim against M&O. Instead, the district court reasoned that notice of a claim had effectively been received by the insurers because the insurers acted as though they had received notice of a claim. The court concluded, "[i]f it looks like a duck, swims like a duck, quacks like a duck, and is prepared for dinner like a duck, it's probably a duck . . . . Information received and recorded as a timely claim by the parties will be deemed a timely claim by the Court." The district court denied the insurers' motion for summary judgment, ruling that "[t]his declaratory action shall proceed against the 2011-2012 excess insurers."

Following this determination, the Jordans settled with M&O's secondary excess liability insurer and its subsequent underlying insurer, leaving Evanston as the only defendant. The Jordans filed a motion to compel payment of the Zucker settlement, but the district court denied the motion as premature. Shortly thereafter, the jury in the Jordans' primary action against M&O returned a verdict in favor of M&O. Evanston then filed a new motion for summary judgment, arguing it could not be obligated to defend M&O further or to pay the settlement because the Jordans had failed to prove M&O was liable for any harm. Because there was no liability, Evanston asserted there was no possibility of an actual claim to invoke coverage for the settlement. The Jordans opposed the motion, contending that a jury verdict was not necessary to trigger coverage and that regardless, the potential for liability at the time the parties agreed to settle was sufficient to sustain coverage.

The district court concluded that Evanston was not obligated to fund the settlement made by Zucker because any duty that Evanston had to

indemnify him could only be asserted once the Jordans established that his potential liability implicated a covered loss. The court reasoned that because "the jury [in the Jordans' underlying action] has now determined that the plaintiffs should not recover anything on their bodily injury claims [t]his factual finding should control . . . . On this record, Evanston is not required to indemnify Zucker for the $20 million pre-trial consent judgment." However, the district court nonetheless required "Evanston to continue to defend its insureds against the Jordans' product liability claims."

Both parties appealed. The Jordans challenge the district court's determination that Evanston was not obligated to fund their settlement with Zucker, and Evanston cross-appeals the court's earlier conclusion that Evanston had timely received notice of a claim made by the Jordans.

## II.

## A.

We review summary judgments *de novo. RealPage, Inc. v. Nat'l Union Fire Ins. Co.*, --- F.4th ----, ----, No. 21-10299, 2021 WL 6060972, at *2 (5th Cir. 2021) (quoting *Luminant Mining Co. v. PakeyBey*, 14 F.4th 375, 379 (5th Cir. 2021)). Likewise, "[a] district court's interpretation of an insurance contract is a question of law reviewed *de novo*." *Columbia Cas. Co. v. Ga. & Fla. RailNet, Inc.*, 542 F.3d 106, 110 (5th Cir. 2008) (citing *Am. States Ins. Co. v. Bailey*, 133 F.3d 363, 369 (5th Cir. 1998)).

Before analyzing Evanston's policy, we must determine what law applies to its interpretation. This case involves Mississippians suing insurance companies in federal district court in Mississippi over a policy issued to a New York limited liability company in New York. When a federal court hears a diversity case, "the choice of law rules of the forum state . . . determine which state's substantive law applies." *Hartford Underwriters Ins. Co. v. Found. Health Servs., Inc.*, 524 F.3d 588, 593 (5th Cir. 2008) (citing *In*

*re Katrina Canal Breaches Litig.*, 495 F.3d 191, 206 (5th Cir. 2007)). In Mississippi, the forum state here, a conflict of law analysis is only undertaken if the substantive law of the two potential states, Mississippi and New York, actually conflict. *Smith v. Church Mut. Ins. Co.*, 254 So. 3d 57, 65 (Miss. 2018). The parties presume that New York law applies, but, skipping this step of the analysis, neither the parties nor the district court ever identified any conflict between Mississippi law and New York law. We discern none, so we apply the law of the forum state, Mississippi.[3]

Turning to the merits, because our determination of Evanston's cross-appeal is dispositive, we first address Evanston's contention that the district court erred in finding that Evanston had received notice of a claim. We agree that the district court erred and hold that the Jordans have failed to demonstrate that they made any claim against M&O during the policy period. As a result there was no coverage, and Evanston had no obligation to indemnify M&O's CEO for the parties' settlement.

## B.

This case hinges on the threshold requirements under the Evanston policy that (1) a claim be made against M&O, and (2) notice of that claim be timely provided to Evanston, in order to trigger coverage. The district court sidestepped the first question and instead focused on the second. The court took this approach because it found that Evanston *acted as though* it had received a claim after M&O initially forwarded the WWL news article, by opening a "Claim/Occurrence" file and continuing to monitor whether any lawsuit had been filed by the Jordans against M&O. Surmising that "[i]f it

---

[3] Were there a conflict between New York and Mississippi law under Mississippi's center-of-gravity test, New York law would control. *See generally Zurich Am. Ins. Co. v. Goodwin*, 920 So. 2d 427 (Miss. 2006) (laying out the applicable steps and analysis for the center-of-gravity test).

looks like a duck, swims like a duck, quacks like a duck, and is prepared for dinner like a duck, it's probably a duck," the district court held that "[i]nformation received and recorded as a timely claim by the parties will be deemed a timely claim by the Court." But ducking the question of whether a timely claim was actually made, by "deeming" it so, was error.

We begin by considering what it means to make a "claim" under Evanston's policy. The policy itself does not define "claim," but "[g]enerally, under Mississippi law, when the words of an insurance policy are plain and unambiguous, the court will afford them their plain, ordinary meaning and will apply them as written." *Minn. Life Ins. Co. v. Columbia Cas. Co.*, 164 So. 3d 954, 968 (Miss. 2014) (quoting *Noxubee Cnty. Sch. Dist. v. United Nat'l Ins. Co.*, 883 So. 2d 1159, 1165 (Miss. 2004)). The Mississippi Supreme Court "resort[s] to such compendia of knowledge as dictionaries, often the Merriam-Webster Dictionary, to determine these common and ordinary meanings." *Taylor Constr. Co., Inc. v. Superior Mat Co., Inc.*, 298 So. 3d 956, 959 (Miss. 2020) (citing *Rankin Cnty. Bd. of Supervisors v. Lakeland Income Props., L.L.C.*, 241 So. 3d 1279, 1289 (Miss. 2018)); *see also Mayor Butler v. Watson* (*In re Initiative Measure 65*), No. 2020-IA-01199-SCT, --- So. 3d ----, ----, 2021 WL 1940821, *7 (Miss. 2021) (citing *Watson v. Oppenheim*, 301 So. 3d 37, 42 (Miss. 2020)); *Minn. Life Ins. Co.*, 164 So. 3d at 969. We will therefore do likewise.

Perhaps the leading treatise on insurance law states that

"claim," as used in a provision of an insurance policy requiring the insured to give timely notice of a claim, connotes the following: authoritative or challenging request; demand of right or supposed right; calling on another for something due or supposed to be due; and demand for compensation, benefits, or payment. In other words, a "claim" is an assertion by a third party that, in the opinion of that party, the insured may be liable to it for damages within the risk covered by a policy . . . .

13A COUCH ON INSURANCE § 191:10 (Stephen Plitt et al., eds.) (3d ed. Dec. 2021). One dictionary defines "claim" as "a demand for something due or believed to be due . . . [;] a right to something . . . [; or] something that is claimed[.]" *Claim*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (11th ed. 2003). Another defines "claim" as "1. [a] statement that something yet to be proved is true . . . . 2. The assertion of an existing right; any right to payment or to an equitable remedy . . . . 3. A demand for money, property, or a legal remedy to which one asserts a right[.]" *Claim*, BLACK'S LAW DICTIONARY (11th Ed. 2019). Whatever the nuance between these definitions, a common thread is that a "claim" involves a "demand" or "assertion" made by a claimant against a party who could satisfy it.

The Jordans contend that news articles referencing Braylon's injuries constituted a claim, and that when M&O transmitted them to its insurers, that provided the requisite notice. They focus specifically on the June 2012 CNN article, asserting that a claim was made against M&O via Meaghin Jordan's statements in that news story: "I would love to get [M&O's magnets] banned . . . I don't want this to happen to anyone else." But Meaghin Jordan's statements to CNN do not evidence an "assertion of an existing right[,] any right to payment or to an equitable remedy," or a "demand for money, property, or a legal remedy" for her or her son's injuries. *Claim*, BLACK'S LAW DICTIONARY (11th Ed. 2019); *cf. Security Mut. Ins. Co. v. Acker-Fitzsimons Corp.*, 31 N.Y.2d 436, 443 (N.Y. 1972) (noting that when insureds have notice of potential liability through the media, they ought to investigate and determine if coverage can be invoked).

Even assuming they did, and that constituted a "claim" under Evanston's policy, Meaghin Jordan made the comments to a media outlet, *not to M&O or Evanston*. Her statements to CNN, while expressing an understandable sentiment, did not put M&O and its insurers in a position to

defend against "[a] demand for money, property, or a legal remedy to which one asserts a right[.]" *Claim*, Black's Law Dictionary (11th Ed. 2019). And nothing in the record indicates that the Jordans tendered any other communication to M&O or Evanston before their counsel sent their demand letter to M&O on December 11, 2012—outside Evanston's policy period.

The entirety of the district court's analysis on this issue, much like the Jordans' argument on appeal, focused on the fact that M&O forwarded news articles it happened to see to its insurers, including Evanston. The district court reasoned that because the insurers had notice of the articles describing Braylon Jordan's injuries, including Meaghin Jordan's statements quoted above, and because the insurers on occasion internally referred to the media reports as evidencing a "claim," the initial requirements for coverage were met. But this reasoning neglects the fact that "the insured's awareness of an alleged injury is not enough to constitute a claim." *Titan Indem. Co. v. Williams*, 743 So. 2d 1020, 1025 (Miss. Ct. App. 1999) (citing *Ins. Corp. of Am. v. Dillon, Hardamon & Cohen*, 725 F. Supp. 1461, 1468 (N.D. Ind. 1988)); *accord The Yale Club v. Reliance Ins. Co. in Liquidation (In re Ancillary Receivership of Reliance Ins. Co.)*, 863 N.Y.S.2d 415, 418 (N.Y. App. Div. 2008) (concluding in a coverage dispute where "claim" was undefined that the plaintiffs' actions did not rise to "an assertion of  legally cognizable damage, . . . a type of demand that can be defended, settled and paid by the insurer" (quotation omitted)). The fact that M&O became aware of media reports about Braylon's injuries and sent those reports to Evanston, which in turn opened an internal "Claim/Occurrence" file and monitored further developments, does not substitute for the Jordans actually making a timely claim against M&O. Their failure to do so is fatal to their assertion of coverage.

## C.

Turning now to Evanston's obligation to fund the settlement between the Jordans and Zucker, the duty to indemnify does not attach until there is a covered loss. *See Corban v. United Servs. Auto. Ass'n*, 20 So. 3d 601, 616-17 (Miss. 2009). As there was no coverage triggered under its policy, Evanston is not obligated to indemnify Zucker for the agreed amounts in his settlement with the Jordans.

## III.

Because no claim arising from Braylon Jordan's injuries was timely made against M&O during Evanston's policy period, Evanston is not obligated to provide M&O costs of its defense or coverage for the partial settlement between the Jordans and its then-CEO Craig Zucker. For this reason, we AFFIRM the judgment of the district court that Evanston was not obligated to indemnify Zucker, but we REVERSE the district court's denial of Evanston's motion for summary judgment and RENDER judgment in Evanston's favor.

AFFIRMED in part; REVERSED in part; and RENDERED.